1

2

3

4

5

6

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

7   SUNRISE TELECOM INCORPORATED, a          No. C 04-1601 FMS
    Delaware corporation,

8                    Plaintiff,              **CLAIM CONSTRUCTION ORDER**

9   v.

10  ACTERNA, LLC, a Delaware limited liability
    company,

11

12                   Defendant.
                                        /

13

14          This case deals with the alleged infringement of two patents.  Plaintiff Sunrise has asserted that

15  Acterna has infringed its patent, number 5,619,489 ("489"), and Acterna has counterclaimed that

16  Sunrise has infringed its patent, number 5,751,766 ("766").

17          The parties presented oral argument addressing the proper construction of five disputed claim

18  terms per patent at the *Markman* hearing held on March 25, 2005.  The Court considered the oral

19  argument, written briefs, supporting declarations and exhibits and issued a Tentative Order construing

20  the disputed language in the '489 and '766 patents on April 7, 2005.  The Tentative Order allowed the

21  parties to request a hearing to address specific issues with the Order.  Acterna requested a hearing,

22  held May 17, 2005, and both parties submitted additional briefing.  The Court has considered the

23  additional briefing and oral argument and adopts the following claim construction.

24                          **I. CLAIM CONSTRUCTION LEGAL STANDARD**

25          Patent claim construction and interpretation is a question of law, determined by the Court.

26  *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517

27  U.S. 370 (1996).  To properly construe the terms, a court first looks to the intrinsic evidence,

28

including the wording of the claims and the specifications and drawings. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). Claim terms should be understood and construed in the context of one another. *Apex, Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003). At claim construction, words should be given their ordinary meanings, unless the patent specifications clearly indicate otherwise. *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed. Cir. 1995). Further, a claim term must not be narrowed unless the patent language clearly narrows the scope of the meaning. *See SunRace Roots Enter. Co. v. SRAM Corp.*, 67 USPQ2d 1438, 1442-43 (Fed. Cir. 2003). Only after the Court considers intrinsic evidence may it resort to the extrinsic, i.e. expert testimony, treatises and other materials. *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1308 (Fed. Cir. 1999).

## II. CONSTRUCTION OF CLAIM TERMS

**'489 Patent**

The '489 Patent is related to a testing system for high-speed, digital communication networks. The parties have addressed the construction of five separate claim terms, discussed below.

| Claim Term 1 | Construction |
|---|---|
| Configuration of a Communication Transmission Network | The characteristics of the network that define its logical operation. These characteristics include, but are not limited to, the type of framing used, the type of multiplexing used, the level or amplitude of the signal at its assigned port and the channel(s) on which broadcast data is transmitted or received. |

The parties agree on the beginning of Sunrise's proposed construction**,** but disagree on the inclusion of the several examples, specifically the "channel on which test data is transmitted or received." Acterna Brief at 12. Acterna argues that, even though the framing, multiplexing and amplitude of the signal are all characteristics of the network, the channel isolated for testing is not. *Id.* at 13. The Court agrees.

The Court's construction includes the portion on which both parties agree and the examples that refer to the network generally, but modifies the channel example so that it reflects the channels of the network generally, not the specific channel where the testing takes place. Although Acterna has

2

argued that "channel(s) on which broadcast data is transmitted or received" still refers to channels for testing, the Court disagrees.

| Claim Term 2 | Construction |
|---|---|
| User Input Device for Inputting Operating Instructions to Said Microprocessor; Said Operating Instructions Including a Configuration of a Communication Transmission Network. | A device that allows an operator to input operating instructions into the device. Examples include, but are not limited to, a keypad, function keys, keyboard, mouse, or wand. |

Acterna's argument fails to rebut the presumption against a means-plus-function interpretation. "User input device," in light of the entire patent, demonstrates a definite structure. Additionally, the Court's proposed instruction is consistent with Judge Whyte's earlier construction of this same term. *See Sunrise Telecom, Inc., v. Electrodata, Inc.*, Case No. C-97-20666.

Last, to address Acterna's inquiry at oral argument, the Court sees no reason to entertain equivalents arguments; thus no additional briefing is required for the construction of this claim term.

| Claim Term 3 | Construction |
|---|---|
| Updating Said Configuration According to Said Change; Wherein Said Configuration is Displayed as Said Configuration is Being Changed | Producing and storing a graphical display of the characteristics of the network that define its logical operation while such characteristics are being altered. |

The Court agrees, for the reasons set forth by Acterna, that storage must be a function of updating in order to differentiate it from the term inputting. This construction appropriately construes the term in context. *See Apex*, 325 F.3d at 1371.

//

//

//

//

//

//

**United States District Court**
For the Northern District of California

| Claim Term 4 | Construction |
| --- | --- |
| Graphical Display Showing Said Configuration as Said Configuration is Being Input | A display capable of generating both graphical and textual images.  The graphical display includes characteristics of the tester that match the characteristics of the network that define its logical operation.  These characteristics include, but are not limited to, the type of framing used, the type of multiplexing used, the level or amplitude of the signal at its assigned port and the channel on which broadcast data is transmitted or received.<br><br>The graphical display, reflecting the characteristics of the tester, is updated to match the characteristics of the network that define its logical operation while the characteristics are entered. |

First, a common sense understanding of graphical display would include both pictures and text. As discussed at oral argument, a pictorial map without text labeling would provide little use.  Thus, both text and graphics are necessary in order to convey "said configuration."

Second, Sunrise uses the terms "graphical illustration" and "graphical display" virtually identically.  *See* Sunrise Brief at 5, 10.  The word "illustration" generally implies pictorial representation. Thus, the Court modifies Sunrise's proposed definition to replace "graphical illustration," with "graphical display" in order to reduce this potential confusion.

Third, although a functional tester must match the configuration of the network to test successfully, a user's changes to the tester do not change the configuration of the network.  Rather the changes made to the tester adapt the characteristics of the tester so that it, ideally, matches the network.

//

//

//

//

//

//

4

| Claim Term 5 | Construction |
|---|---|
| Graphical Editing of Said Configuration | Providing commands that adapt the characteristics of the tester (to match the network) that define its logical operation by modifying a graphical display of these characteristics. |

A fundamental characteristic of the patent is allowing a user to configure the tester by using a graphical interface that includes both pictorial and text elements.  This understanding is consistent with the other terms construed for this patent.

Again, the Court replaces the term "graphical illustration" with "graphical display."

**'766 Patent**

The '766 patent relates to a test instrument designed to non-invasively test the performance of a digital communication system by detecting the difference between a signal sent and a signal received. The difference between signals is the result of interference, caused by a variety of possible sources. The tester calculates statistics related to the differences in signals that are helpful to resolving this interference or noise.

The parties have addressed the construction of five terms related to the '766 patent litigation. Each of these are discussed below.

| Claim Term 1 | Construction |
|---|---|
| Ideal Modulation Signal | A pair of I and Q values which correspond to a digital signal, represented as one of a set of predefined ideal points on a constellation chart. |

The patent teaches that the constellation points convey signal values, both ideal and estimated. The patent language specifies that it is the "points in the coordinate space represented by the graph..." that are conveyed.  '766 patent 5:35-39.  The chart provides an example of an idea that has been adequately reduced to a practical application, i.e., the communication of digital signals, thus making it patentable.  *See State Street Bank and Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368, 1373 (Fed Cir, 1998) (asserting that mathematical equations are abstract unless reduced to a practical purpose).

**United States District Court**
For the Northern District of California

For consistency between terms, and because the testing process compares the ideal to the estimated signal, it is reasonable that both terms specify digital data.

| Claim Term 2 | Construction |
|---|---|
| Estimated Modulation Signal | A pair of I and Q values identifying a point on a constellation chart and corresponding to the transmitted digital data that was distorted. |

The parties have conceded that there is virtually no difference between the x and y representation and the I and Q representation. Because the ideal modulation signal has been defined in terms of I and Q values, the construction for the estimated modulated signal should follow suit.

| Claim Term 3 | Construction |
|---|---|
| A Symbol Decoder that Translates a Representation of Said Estimated Modulation Signal Output into Estimates of Said Digital Data | A decoder that converts a point on a constellation chart (which represents the estimated modulation signal) into a reconstruction of originally transmitted data. |

Sunrise has failed to rebut the presumption that means-plus-function does not apply to this term. The inclusion of the symbol decoder represents sufficient corresponding structure to the function of converting estimated modulation signals into digital data. *See* Chin Decl. Exh. H.; Acterna Brief at 20. Further, the orthogonal chart and I and Q values are not mere abstractions, but have been reduced to a practical purpose.

Acterna's proposed definition is consistent with the other claim terms specifically in how it discusses the representation of signals as I and Q values, and addresses the estimated signal as a representation of the original digital signal.

//
//
//
//
//
//

| Claim Term 4 | Construction |
|---|---|
| A Difference Signal Generator that Generates an Ideal Difference Signal Between Said Ideal Modulation Signal and Said Estimated Modulation Signal as an Estimate of an Interfering Signal, Said Difference Signal Being Resolved into Orthogonal Components | A signal generator that generates a pair of I and Q values corresponding to the difference between the ideal modulation signal and estimated modulation signal. |

The specifications only refer to a difference, not the specific subtraction of one value from another. Further, Sunrise has failed to rebut the presumption against a means-plus-function analysis.

| Claim Term 5 | Construction |
|---|---|
| Calculating Statistics of Said Difference Signal Using Said Orthogonal Components Using Said Diagnostic Processor | Using the diagnostic processor and the received I and Q values of the difference signal to calculate statistics for the purposes of diagnosing the communication channel. The diagnostic processor is a processor that performs calculations to diagnose a communication channel. Statistics are a mathematical calculation/numerical analysis of a set of data that characterize the data set. |

The "I and Q values received" is clear in light of the earlier terms, specifically in light of term 4 that defines the calculation of the difference signal. "The separation of the I and Q values," proposed by Acterna, however, is unclear, and not adequately defined by the specifications or other claim terms. *See Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (asserting that elements of a claim must be understood in light of the entire claim and patent specifications). Finding that the patent specifications, along with the claim language itself, fail to describe this separation, the Court excludes this language from the definition. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Understood in context of the claims, the diagnostic processor is linked to the diagnosis of a particular channel. Acterna Brief at 23. Thus, in light of defining the terms in context, the Court adopts Acterna's argument that the processor diagnoses a particular channel.

*//*

**III. CONCLUSION**

The Court construes the subject term definitions for both the '489 and '766 patents, for the reasons articulated above.

**IT IS SO ORDERED**


Dated: May 19, 2005                                          _____/s/_____
                                                            FERN M. SMITH
                                                            UNITED STATES DISTRICT JUDGE